Here ye, here ye, here ye, the United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States, this Honorable Court. Thank you. Good afternoon. We are here to consider cause number 25-60040, Prado-Majano v. Bondi. I may not have pronounced his name correctly. Mr. Roth. Good morning, Your Honor. May it please the Court, Charles Roth for the petitioner, Mr. Prado-Majano. Three issues presented by the case today, whether the board erred in its consideration of changed country conditions, whether the board erred in its consideration of the equitable tolling claim and the government raised on in its appeal briefing a number bar issue. I plan to address the issues in that order. If the Court obviously asks questions, I will diverge. So I'll begin with the changed country conditions questions. What the board said is, we think, a misreading of this Court's decision in Nunez. The board said, in short, that a change in personal circumstances is insufficient to show a change in country conditions. And that's not exactly right. A mere change in personal conditions may not suffice to show a change in country conditions in the ordinary situation. But the question is really whether that personal change is part of a larger change. And that can be, you know, some people happen to be, you know, royal families in Russia. I gave, you know, an example, obviously. Situations like that, something that affects a single person may also affect the government because the person is part of a much larger situation. And here, our client is not a big fish. He's a small fish that got caught up in a larger current. He was part of a larger material change in the situation in El Salvador. And we think the text of the statute supports our understanding of this provision. The text of the statute doesn't talk about personal conditions. It talks about country conditions. So the personal situation thing is sort of a gloss on the statutory text. But the country conditions. What is the standard of review here? Is this a fact finding by the IJ or is this something more akin to the question of law? Well, we would say first that it's a misstatement of law by the Board of Immigration Appeals. But more generally, if an IJ or the BIA's finding about country conditions and whether there was a is that a fact finding? In other words, are we traveling under substantial evidence standard? We don't believe so. The board is the agency that made the determination about change country conditions. In this case, the board itself, in general, can't make fact finding at all. Its regulations forbid it from doing so. Now, there are some cases where non-citizens have put forth claims and the board has found that it's just so crazy or implausible that sometimes that would feel sort of like a fact finding question if they said, you know, the Martians got me. There are certain claims that have been raised over the years that have just been seen so implausible that they just don't believe you. How do we know when we cross the line from personal conditions, something happened in this petitioner's family, to into country conditions? I mean, is there some case law, something that delineates this so we may know where to draw the line? Yeah, the court has issued a number of decisions. I would suggest that you think of it in terms of mere personal conditions as opposed to personal versus country conditions. Because I think when courts talk about personal conditions, they basically mean not a changing country condition, something that just influences, just affects, you know, a smaller group of people. So, for instance, we've seen cases where a woman faced an increased risk of domestic violence after deportation because her abuser had been deported and was waiting for her to get her when she got back. Obviously, that's a material change. It's going to affect the risk for her, but it's just that affects the risk only for her. It doesn't affect the broader country conditions. The courts used words like dramatic, but it's got to be something that's not just something that that his family cares about. And here we have a situation where, you know, this specific changed conditions and what evidence can we find in the record of changed country conditions that are not particular to your client? In other words, what happened in the country that makes it changed for purposes of this issue? Right. So, let me answer that in three parts, I think. The context was, as you know, unchanged in a way. President Bukele in El Salvador has, you know, putatively, there's this iron-fisted war that he's supposedly waging. He's got 70,000 people in these jails because they're involved with gangs. And this is presented as a decisive break from the past. The revelation in 2023, our government managed to extradite Elmer Canales Rivera, second highest leading member of MS-13, who supposedly was serving 40 years in a Salvadoran prison. But he wasn't in prison. It turns out high Salvadoran officials ordered his release from prison. And themselves literally took him out of prison and got him out of there. And the United States government, our treasury, imposed sanctions on those high-ranking Salvadoran government officials because of their role in this precise matter. And then eventually, once we were able to get him the DEA, I think his girlfriend was doing something on social media. And so they found him where he was. He was partying or something. And they got him and they extradited him to the U.S. The attorney general, the head of the FBI, the secretary of DHS were at this press conference talking about the arrest of Elmer Canales Rivera. This is not the difference between... How is all this a change in the country conditions in El Salvador? I mean, I don't think what happens in the United States can constitute that, can it? I think it doesn't constitute it. It's just evidence. It's relevant and it acknowledges the significance of the developments. This was, I think, a big scandal that played out in different countries. He was freed in El Salvador, but arrested in Mexico. The reporting, the journalists in El Salvador have largely been sort of forced to leave that country because of the state of exceptions. So now reporting on El Salvador occurs by entities that are in neighboring countries that are still managing to do their reporting, but they're just not there in the country because they can't be. If they were, they would face these arrests. And so you have the scandal sort of unfolds in different phases. There was reporting. Some people got a hold of some recordings of these governmental officials. So I'm not sure that answers. Your question was, how is this a change in country conditions? And we it's not a secret that governments in our neck of the woods that find themselves in bed with narco traffickers face potential intervention. Let me interrupt your answer. But in particular, we're talking about your client entered this country in, according to the record, May of 2022. So as I understand, tell me where I'm wrong. Changed country conditions would mean that he entered here under one situation in May of 2022. And then while he was here, something happened in his country of origin that has been of such a dramatic nature that it makes it legally impossible under our standards that we're dealing with to return to that country. So what I'm focused on is what happened in El Salvador between May of 2022 and the time of his hearing when the issue was taken up. What can you tell us about that? Well, I believe my brother would agree with you that the relevant sort of snapshots are at the time that the initial hearing happens and then the time when the motion to reopen is filed. And so when I mean, he obviously had experienced some negative. So that's the reason he fled the country in the first place. As I mentioned, his wife's father was a high ranking member of the Salvadoran gang, and he gets extradited to the United States. There are media reports that suggest that he is cooperating with our government. So now you have a situation where he has knowledge of these dealings with the Salvadoran government and the gang. The gang doesn't like him because he's supposedly cooperating with the United States government. The Salvadoran government doesn't like him because he knows things that are skeletons in the closet. So now, as a family member of this individual, my client faces threats and dangers that are unique. And the FBI commented that was specific to his wife. But there is a letter in the record from the Federal Bureau of Investigations that that's how they see it too, that there's a danger to all family members of this gentleman because of the putative cooperation. I don't represent him. I can't speak to that cooperation. I don't know anything about it any more than the court does. But that's the situation. So it's a massive development in the situation of El Salvador because if you're the Salvadoran government, you have to be protective of your... They've been cultivating this reputation as an anti-gang force. That's their thing. And they need to protect that because if they are seen as cooperating with the gang instead of fighting the gang, they face not only sanctions, but other anti-regime developments from the United States government. And so it's in their interest to suppress that sort of thing. And if you're in the way, the answer is put you in jail and keep you there until the threat passes. That's our changed country conditions. I don't think anyone disputes that the change is material as to the fear that my client would suffer. The only question is whether it's dramatic enough or big enough to constitute changed country conditions. And we think it plainly is. Before I run out of time, I don't want to forget to address the equitable tolling. Your Honor, it looks like you might have another question. So I don't want to jump forward too quickly. There were two rounds we gave for seeking reopening. One was the changed country conditions. That gets us around the 90-day time limit on a motion to reopen. The other argument we made was to equitably toll the 90-day deadline on account of ineffective assistance of counsel and a number of other factors unique to my client. The board said we hadn't argued that ineffective assistance of counsel was the cause of the delay. And that's all they said about it. That's literally incorrect. We did say we need this because of the ineffective assistance of counsel. I'd like to unpack that a little bit. So if my client had not been represented at the time of his hearing and he went to appeal, he would have been able to raise arguments without satisfying the specific rules of matter of Lozada. And matter of Lozada has three different requirements, which for an attorney or even a paralegal, it's not rocket science, but you need to get a copy of the contract. You need to download a form from the ARDC, fill out the form, give it notice to your prior attorney saying this is how I think you screwed up, and then give the chance to the prior to respond to you and take all that and explain the prejudice to the board of immigration appeals. All that is something that he would not have had to do if he had never had an attorney. And he, quite frankly, would have been better off if he had never had counsel. His attorney, a couple of days before the trial, finally came to talk to him, found out that he was born in Mexico, which the attorney apparently had never known. And then he said, well, why don't we just ask for you to be deported to Mexico instead of El Salvador? Now, to be clear, it would have made perfect sense to want to be deported to Mexico. My client had a right to designate a country for removal. That's statutory. All he had to do was say, I want to designate the country of Mexico for removal. Thank you, your honor. And that's all I needed to do. And instead, the attorney sort of got him to sold him a bowl of porridge here, less than a bowl of porridge, because it was a bowl that he already had. All he had to do was say he wanted to be deported to Mexico. And that's all the exchange for that. He gave up his right to seek protection, which he had been sitting in jail, fighting for the chance to get that hearing for over a year. So, you know, the government doesn't defend the actions of prior counsel. The only question that my brother raises is whether that caused the later delay. And as I tried to explain, there's a number of different things, steps you need to do in order to raise an effective assistance claims to the board's rules. And so we're not challenging those rules. But in order to satisfy them, when you're pro se and you have limited access to the internet and you don't speak English, it's not such an easy thing to do. He was lucky enough to find an attorney in the Bay Area who's willing to help him, not to represent him fully, but to help him do discrete tasks. And she assisted him in raising these claims, but it wasn't done within the 90 days. And so we seek tolling on that basis. I should say, we seek tolling because of the ineffective assistance of counsel and the whole host of related matters, his lack of English speaking ability, the limited access he had to family. What is your best case, set aside the ineffective assistance of counsel, but for all the other factors, which the BIE did not address, what's your best case that supports equitable tolling on those bases, any or all of them? I can't think of a published precedential case that is directly on point to that, your honor. I'd be happy to, if I may file a 28-J letter after the hearing, I'd be happy to produce some of any authority. I just, I wanted to know your, the extent of your argument basically for these other factors, because one of the issues, and maybe you can speak to this, lack of English speaking ability, reliance on family members, some of the other things you cited would apply almost across the board to virtually every immigrant. And that can't be how equitable estoppel is going to be applied, can it? Well, I think that's true. I think that you need to have, I mean, it's certainly, we're not arguing for a global equitable estoppel for every detainee or every detainee who doesn't speak English. But what is the secret sauce that differentiates this case from the global number of cases out there? Well, the first sauce I'd say is that the board needs to address it. And the board said, as you noted, nothing about it. So maybe the board could have said something and you would have deferred to it, but the board also could have found this sufficient, the whole collection. I do think the ineffective assistance of counsel would be part of any secret sauce if we were to actually get over the hurdle of equitable tolling. So I know that's not a full answer to your question, Your Honor. I think that whenever you have these multi-factor tests, it's always hard to, there's just, by definition, there's not a sort of a bright line where things are going to be on one side or the other. The board is tasked with assessing this and balancing the factors one against the other to figure out whether he's done enough to show equitable tolling. If there are no further questions, I'll reserve the balance of my time for rebuttal. Thank you. Mr. Wiggers. Thank you, Your Honor. And may it please the court, Edward Wiggers for respondent, Attorney General Bondi. And Judge Wilson, if I may begin with your question about the standard of review, motions to reopen generally are governed by the abuse of discretion standard review. However, for your specific question regarding the personal safety of the person circumstances issue, that really is a question of fact, whether these are personal circumstances or changes arising in El Salvador, which would be subject to substantial evidence. And while counsel said the board is correct that the board generally cannot engage in fact-finding on a motion to reopen, we're in a totally different context. It's not an appellate review. It's looking at whether they should reopen the case below and restart the evidentiary proceedings. There, the board has to assess the evidence. It would have to make some sort of factual determination to determine whether the case should go back for a new evidentiary hearing. Congress permitted aliens to file only one motion to reopen their immigration proceedings and did not tether it to a final order of removal. Mr. Prado actually filed three motions to reopen in this case. His first one was his effort to reopen proceedings before Judge Canalacos, which was successful. And those proceedings then merged into the hearings in front of Judge Medved. His second motion was the motion to reopen the evidentiary hearing in front of Judge Medved, which failed. That motion is what triggers the number bar in this case with his second effort to reopen Judge Medved's proceedings. But even if the number bar argued prior to it being court's decision in Jye, it's not so much a question of what the board decided, but it's more of a futility matter. Because even as the court said in Jye, even if the board erred in another matter and in Jye the court assumed error, the court declined to remand because the number bar applied and the board would never be able to grant the motion to reopen. So even if the board erred here on either the changed circumstances or the equitable tolling, the court still cannot remand because of the number bar. We're not raising it as part of the agency's decision, we're raising it essentially in a futility context. But even if it doesn't apply, Mr. Prado cannot overcome the time bar. He needed to show a material change in conditions between the time of his hearing and the time that he filed his motion, pointing to his personal circumstances consisting of his relationship with his father-in-law and the effect of that relationship on his personal situation is not a change in conditions arising in El Salvador, which is what the statute actually requires. And he also did not conduct the necessary analysis in his motion to show that the conditions on the ground in El Salvador had changed so much to where he was at a more severe risk of harm if he returned. And without those, he would not be able to satisfy the change conditions requirement. As far as equitable tolling, Petitioner needed to show that there was an exceptional circumstance. Equitable tolling, as the court knows, has two requirements, due diligence and an exceptional circumstance that justifies the tolling that caused the motion to be late that was beyond Petitioner's control. So, to the extent he argued basically three things in his motion, that he was pro se and didn't speak English, that he was diligent, and that he received ineffective assistance of counsel. Being pro se and not speaking English is unfortunately common in all these immigration cases. Being diligent is a separate consideration for equitable tolling. It doesn't go to whether there's an exceptional circumstance that justifies reopening because you missed your deadline. That just leaves the ineffective assistance claim. His motion was actually pro se, and Mr. Donohue's performance, whatever its caliber, did not affect the timeliness of the filing of the motion. So, it cannot constitute an exceptional circumstance that caused his motion to be late for which it could serve as a basis for equitable tolling. And counsel made the statement that he believed no one is challenging whether there's been a material change. We are challenging whether there's been a material change. We would point out that most of the evidence he submitted on conditions actually in El Salvador is exactly the same as the evidence that he submitted with his prior motion. He submitted the same reports, Dr. McNamara's affidavit and the Cristosal report, which are two big pieces of evidence. And so, there's really nothing showing that there's been some sort of evolution in conditions in El Salvador. Well, what would cross the bridge from personal circumstances to changed country conditions? I mean, in other words, obviously, you might have the Romanoff example or a coup where the former president's family would certainly have changed country conditions. But I mean, it doesn't have to be to that level, does it? No, Your Honor, it doesn't have to be to that level. And we sometimes see this with some of our Chinese cases where the petitioner suddenly, or while they're in the United States, starts practicing a religion. And then you start looking to whether conditions in China show that China was actually persecuting that particular religion for purposes of whether the change in personal circumstances is starting to practice the religion ties to a change in conditions in the country on the ground. If, in this case, El Salvador had suddenly started persecuting former gang members who joined a church, then possibly if the petitioner had some kind of change in his personal circumstances leading to that, you would have your tether to a change in the country conditions on the ground. The personal change must tie to the evolution on the conditions arising in the country. If it doesn't, then any personal change in circumstances is not going to qualify for the change country conditions exception. Well, here the argument, I guess, is that the family member was important enough and it was an important enough event to change conditions in the country also. I mean, there are cases like that, right? Potentially, yes, Your Honor, but here they did not make that showing. They did not show how conditions on the ground in El Salvador changed in light of Mr. Canales' arrest and prosecution. Here, the conditions on the ground are basically the same from the time of his first hearing to the time of his last motion. There's the strong crackdown against gang members. There's the extermination groups operating in the country. There's the general risks that have gone along with all of that that was discussed in both motions. Now we have the addition of Mr. Canales' arrest and his prosecution and whatever cooperation may or may not be coming out of that. It doesn't show that El Salvador is being more aggressive against gang members because of Mr. Canales' arrest, and that possibly would be the only way this change in personal circumstances would tie to a change in the conditions. If Petitioner had shown that the El Salvador response to gangs had increased because of Mr. Canales' arrest, then he'd have some kind of a tie, but we don't have that here. He didn't even make the effort in his motion. I would also like to point out that in this case, Mr. Prado did, in fact, have his hearing on his applications for relief. He had a full hearing in front of Judge Canalacos. Judge Canalacos addressed every application he made. Most of them were rejected because of the serious non-political crime bar, because of Mr. Prado's participation in extortion as a member of MS-13. That left his request for deferral removal under the Convention Against Torture, which Judge Canalacos also denied, and the board affirmed. The basis for the remand back to the immigration judge as a result of Mr. Prado's successful motion was to consider the impact of his data being included in the data leak that DHS experienced in that time frame. The immigration judge was only supposed to consider deferral removal as impacted by the data leak. So, it's not like Mr. Prado has never had a hearing on his claims. He's had that hearing and he's lost. He got one chance for a second hearing and that's when he withdrew his applications. So, it's not like he's never had a chance. The court does not really need to reach the change in country conditions issue because the time bar controls this case. But even if it didn't, petitioner's efforts fall short of the standard both for change conditions and for the equitable tolling. Subject to the court's questions, that concludes our presentation. Thank you, counsel. Mr. Roth? Thank you, Your Honor. I want to briefly address the number bar issue. The statute says that a motion to reopen has to be filed within 90 days of a final administrative order of removal. We don't see how that is unclear in the slightest. The text counts only a motion that's filed after an administratively final order. When there was an administrative appeal of the earlier order, the case was not yet administratively final. That's what the Board of Immigration Appeals case law also says. The government doesn't even address or seek to distinguish that precedent. It doesn't say the board got it wrong. It just acts as if the board never acted at all. That's not what the... We think the text in the board's case law goes in the same way. This court's case law does so too by talking about the number bar in terms of res judicata. Res judicata only kicks in when there's an actual final decision on the merits. A motion to remand where the removal order has not yet become final is an interlocutory matter. It just doesn't count. The motion to remand doesn't count in that context. Even if it did, this court in Mar-a-Dia held that the number bar is a claim processing rule that can be waived. That's consistent with the Supreme Court's decision last term and rightly. The government doesn't explain why the board was unable to waive the res judicata. We think the government's number bar issues plainly fail. Do you agree with counsel opposite that we can reach the issue? We don't think you should reach it. The Chenery Doctrine normally holds that you assess an agency's decision based on the grounds given by the agency, not what counsel cooks up on appeal. I don't mean that in a pejorative sense. Obviously, good attorneys always think of new arguments as the case proceeds, but that's not enough. You're not supposed to consider those matters. Counsel argues that this futility exception, because he claims, in a sense, treating it almost as a jurisdictional rule as opposed to something that can be waived, excused, and that does even setting aside the question of whether it would be implicated at all here, given that there was a non-final situation at the time the motion to remand was filed. So we don't think you should reach it. We don't think you need to reach it. And then in terms, I see I've got 10 seconds left, so I think I'll just wrap up my presentation. My client faces grave dangers because of the situation of his father-in-law. The FBI itself says so. Common sense says so. His chances of being killed and tortured increased dramatically because of what happened in the world. And we ask, therefore, that the court grant the petition to order the board to reassess the situation. Thank you. I do have a question. What happened? Is there a chance he could be removed to Mexico? Well, there was a chance that he could be removed to Mexico. The court denied the stay of removal, and he was removed physically to El Salvador. There was video that Salvadoran government has a policy of videotaping people who are taken into their anti-terrorism facility, the CICOT facility, and his family saw him. Those are online. And so he was taken there, and he hasn't been heard from since. All right. So let's assume we wanted to rule his favorite. We said he must be removed to Mexico. Would that, how would that relief be? Could we order that, and how would that be implemented? I don't think the court would order that he would be removed to Mexico. I think the court could say that the agency erred in not considering that. What normally happens in these cases is if we prevail on the appeal, and then we will do our best to get our client back into the country, normally the government will facilitate removal. What that includes may depend on individual cases. And in some cases, the U.S. government may not be able to obtain his return to the United States, but we would certainly make every effort to secure that. And it's been raised in various other cases, whether a case becomes moot after somebody's removal from the United States, and the court's case law is fairly clear at this point that it does not do so. I don't know if that answers your question. All right. Let me ask, is there a reason he could, if this just went back to the board, I'm trying to ask, are there legal reasons why he could not be removed to Mexico? Is it, was there, he's not really a Mexican citizen? Is there any impediment as a question of law, fact, assuming we could get it back to the board? I'm just trying to find out, is Mexico, would it have been a real alternative? My client sought to leave voluntarily to Mexico. He was born in Mexico. The Mexican government, it's my understanding they never made a final determination whether he was a citizen or was not a citizen at that point, because we could deport him to El Salvador. The U.S. government just deported him there instead. So I, I, we, we, our position is that he could be removed to Mexico and we'd much prefer for him to be removed to Mexico. Thank you. Thank you, Cancel. Anybody else have any other questions? All right. We have your arguments that will conclude the arguments this afternoon. This case is under submission. All right. Are you guys going to conference in the Zoom session?